```
 1                  UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                        TAMPA DIVISION

 3        UNITED STATES OF AMERICA,

 4            Plaintiff,

 5               vs.              CASE NO:  8:08-CR-152-T-27MAP
                                 11 JULY 2011
 6                               TAMPA, FLORIDA
                                 1:30 - 3:15 PM
 7                               PAGES 1 - 80

 8        LUIS AUGUSTIN CAICEDO-VELANDIA,

 9            Defendant.

10        _____/

11             TRANSCRIPT OF SENTENCING PROCEEDINGS
             BEFORE THE HONORABLE JAMES D. WHITTEMORE
12                  UNITED STATES DISTRICT JUDGE

13        APPEARANCES:

14        For the Plaintiff:   Joseph K. Ruddy
                               United States Attorney's Office
15                             Middle District of Florida
                               400 N. Tampa Street
16                             Suite 3200
                               Tampa, Florida 33602
17
          For the Defendant:   Jay A. White
18                             Law Offices of White, White &
                                 Associates
19                             Suite 200
                               1 NE 2nd Avenue
20                             Miami, Florida 33132

21                             Jeffrey G. Brown
                               Brown & Doherty, P.A.
22                             Suite 120
                               450 Carillon Parkway
23                             St Petersburg, Florida 33716

24         Proceedings recorded and transcribed by
          computer-aided stenography.
25
```

1    Also present:   Gabriella Loncar, Spanish Interpreter

2    Court Reporter: Linda Starr, RPR
                     Official Court Reporter
3                    801 N. Florida Avenue
                     Suite 13B
4                    Tampa, Florida 33602

5
                         I N D E X
6
     Witness Name                         Page Number
7
     Christopher Scott Cascio
8
     Direct Examination by Mr. Ruddy......    18
9    Cross Examination by Mr. Brown.......    25
     Redirect Examination by Mr. Ruddy....    28

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              COURTROOM SECURITY OFFICER:  All rise.  This

 2     Honorable Court is now in session, The Honorable

 3     James D. Whittemore presiding.

 4              Be seated, please.

 5                    P R O C E E D I N G S

 6              THE COURT:  Good afternoon.  We are here for a

 7     sentencing hearing in United States versus

 8     Caicedo-Velandia.  Let's get the appearances and

 9     then we'll swear the interpreter.  For the

10     government?

11              MR. RUDDY:  Joseph Ruddy for the government.

12              THE COURT:  For the defendant?

13              MR. WHITE:  Jay White on behalf of

14     Caicedo-Velandia who is present before the Court

15     with the assistance of an interpreter.  Also at

16     counsel table is local counsel, Jeffrey Brown.

17              THE COURT:  Good afternoon.  Let's have the

18     interpreter sworn, please.

19              COURTROOM DEPUTY CLERK:  Do you swear or

20     affirm that you will justly, truly, fairly and

21     impartially act as an interpreter in the case now

22     before the Court?

23              THE INTERPRETER:  I do.  Gabriella Loncar,

24     L-o-n-c-a-r.

25              THE COURT:  I have received and reviewed the
```

1    presentence investigation report, as well as the

2    government's 5K1.1 motion, the defendant's omnibus

3    sentencing memorandum and the defendant's

4    supplemental sentencing memorandum.

5         The record reflects that the defendant entered

6    a guilty plea to Counts One through Five of a

7    superseding indictment charging him with conspiracy

8    to distribute five or more kilograms of cocaine, the

9    second count of conspiracy to distribute five or

10   more kilograms of cocaine onboard a vessel subject

11   to the jurisdiction of the United States, engaging

12   in a continuing criminal enterprise, and Counts Four

13   and Five with aiding and abetting individuals

14   onboard a vessel to knowingly distribute five or

15   more kilograms of cocaine.  His guilty pleas have

16   been accepted and he has been adjudicated guilty of

17   those offenses.

18        The addendum to the report indicates,

19   Mr. Ruddy, the government has no objections to the

20   report or the application of the advisory

21   guidelines.  Is that correct?

22        MR. RUDDY:  That is correct, Your Honor.

23        THE COURT:  And does the government move for

24   the additional level for acceptance of

25   responsibility?

1          MR. RUDDY:  Yes, sir.

2          THE COURT:  That motion will be granted.

3     Mr. White, there appears to be one objection based

4     on a two-level enhancement for use of a

5     noncommercial aircraft.  I'll hear you on that, sir.

6          MR. WHITE:  Your Honor, in the case before

7     you, an aircraft other than a regularly scheduled

8     commercial air carrier was never used to actually

9     import a controlled substance into the United

10    States.  And the facts are pretty clear and

11    undisputed.

12         But I would point out, Judge, that what the

13    government's relying on here to prove the

14    enhancement is actually relevant conduct as opposed

15    to facts that are alleged in the indictment and that

16    were stated before the Court in the factual proffer.

17         The facts are such that on four occasions, a

18    private airplane was used to transport a controlled

19    substance from Central America to Haiti.  That

20    controlled substance was then sold to another

21    separate drug trafficking organization.  Payment for

22    the sale was made and the transaction was complete.

23         Then a second drug trafficking organization

24    imported the controlled substance into the United

25    States.  However, my client does not know how they

1    were imported, when they were imported or any of the

2    details of how the second drug trafficking

3    organization conducted their importation scheme.  We

4    don't know if it's by foot, by truck, by boat or

5    even by plane.

6         Your Honor, the *Chastain* case which I've cited

7    in my memorandum is a published Eleventh Circuit

8    opinion.  And in that case, the court states, "The

9    language of the guideline clearly contemplates a

10   completed event, an actual importation.  The court

11   rejected the district court's broad interpretation

12   of the plane language of the guidelines."

13        Also, the *Joelson* case, Your Honor, that I --

14   that I cited in my memo, which the *Chastain* case

15   actually cites to, they also state, "Stretching the

16   definition of used to import to incorporate any use

17   of a private plane, regardless of whether it was

18   used during the actual importation of the cocaine,

19   flies in the face of the plain language."

20        Your Honor, in that case the facts are similar

21   to the facts in this case in that a private airplane

22   was used to transport cocaine from Guatemala -- from

23   Colombia to Guatemala.  The facts in *Joelson* are

24   different than the facts in this case, Your Honor,

25   because there the coconspirators intended to import

1       the cocaine into the United States.

2            The same thing as in *Chastain,* there was a

3       clear intent to import marijuana, that in the

4       *Chastain* case, a plane was going to bring marijuana

5       into the United States from Jamaica.  But for the

6       DEA intervention, those importations would have

7       taken place.

8            Your Honor, the *Iacullo* case, which is the

9       only case cited by -- the case the government is

10      relying on is an unpublished opinion where the --

11      where an actual importation scheme actually takes

12      place, was completed, a one-shot deal.  Even though

13      a private plane did not actually import the

14      controlled substance, a plane was used to fly the

15      cocaine to the Bahamas.

16           Well, Your Honor, in that case, the defendant

17      *Iacullo* was on the plane kicking the bales of

18      cocaine out to the boat, was in Florida when the

19      boat arrived, took the kilos of cocaine off the boat

20      in Florida, stored it in a warehouse in Florida and

21      eventually distributed it.  And in that case, Your

22      Honor, the stipulated facts, the facts agreed to by

23      the defendant and in the PSR and the factual proffer

24      in the indictment were as such.

25           The facts in this case are significantly

1    different.  Nobody in my client's drug trafficking

2    organization can testify to the facts of the actual

3    importation into the United States, which was

4    performed by a completely separate drug trafficking

5    organization.

6         The government is asking you to hold that the

7    enhancement applies every time a controlled

8    substance is transported from one country to

9    another.  Using that logic, Your Honor, if a kilo of

10    cocaine can somehow be identified in the United

11    States as a kilo that was at one point transported

12    from Colombia to a Central American country, then

13    the person in the United States who sells that kilo

14    will be susceptible to that enhancement.

15         I'd ask the Court to not apply the enhancement

16    and sustain our objection.

17         THE COURT:  The *Chastain* case turns on the

18    fact that the conspiratorial agreement to import

19    never was accomplished; correct?

20         MR. WHITE:  Correct.  The same in *Joelson*.

21    They --

22         THE COURT:  Well, that's a distinguishing

23    feature because in this case we do have an

24    importation of cocaine into the United States.

25         MR. WHITE:  I understand that, Your Honor.

1       But the -- not by my client's drug trafficking

2       organization, by another drug trafficking

3       organization.  You have --

4              THE COURT:  What did your client plead guilty

5       to?

6              MR. WHITE:  The indictment is a maritime --

7       maritime conspiracy to import cocaine, paragraph --

8              THE COURT:  And the jurisdictional nexus is

9       what, as you understand it?

10             MR. WHITE:  I'm sorry?

11             THE COURT:  The jurisdictional nexus of that

12      conduct to the United States is what?

13             MR. WHITE:  By -- by a boat traveling in the

14      ocean.  It could be -- the defendant could be

15      charged with importing the cocaine into the United

16      States.

17             THE COURT:  Well, that's my point.  It's --

18             MR. WHITE:  But this is a unique and detailed

19      enhancement.  There's no commentary, there's no

20      policy statements.  The language says import.  I

21      mean, to give meaning to the word import means to

22      fly into the country.  I think usually --

23             THE COURT:  Your client pled guilty to

24      conspiracy to import cocaine into the United States;

25      did he not?

1          MR. WHITE:  Yes, sir.

2          THE COURT:  All right.  So that conspiratorial

3    agreement began when the cocaine was picked,

4    packaged, processed, etcetera, transported to Haiti,

5    then transported to the United States in some

6    manner; correct?

7          MR. WHITE:  Correct, Judge.

8          THE COURT:  Well, then, it seems to me that

9    the distinguishing feature of this case from

10   *Chastain* is that we're not dealing strictly with the

11   intent without a consummation.  We have an intent

12   with the consummation of the importation into the

13   United States.

14         MR. WHITE:  Yes.

15         THE COURT:  And it would seem to me,

16   therefore, that the unpublished decision of *Iacullo*,

17   I-a-c-u-l-l-o, would be controlling.  Tell me why it

18   shouldn't be.

19         MR. BROWN:  Your Honor, if I could be heard

20   briefly on this same issue?  No?

21         MR. WHITE:  Well, Your Honor, because, first

22   of all, we can't identify this as being the same

23   cocaine.  In the boat example you mentioned to, the

24   cocaine that is found on the high seas is the same

25   cocaine that's presented here in court.  In this

1     situation, cocaine is given to somebody else, the

2     defendant loses control.  Yes, another organization

3     does eventually import it, but it's not one

4     importation scheme.

5          And, also, Your Honor, if -- if -- what the

6     Court's suggesting is that, really, there's no need

7     to have the word import in the guidelines.  It

8     should just be transport.  Anytime a kilo of cocaine

9     is transported from one country to another,

10    regardless of how it enters the country or who

11    introduces it, the guideline enhancement would

12    apply.  I think the word import has to be given some

13    meaning.

14          THE COURT:  Well, you do agree that the

15    cocaine that your client acknowledges transporting

16    to Haiti was destined for the United States.

17          MR. WHITE:  Judge, generally speaking, we

18    don't have any specific knowledge.  We don't know

19    how it got there.  Certainly, it's fair to say that

20    that's the direction it was heading.

21          THE COURT:  He pled guilty to Count One;

22    right?

23          MR. WHITE:  Yes, sir.

24          THE COURT:  Count One alleges in the

25    superseding indictment that the defendant controlled

1    maritime cocaine transportation ventures on

2    multi-ton qualities -- quantities, excuse me -- of

3    cocaine from the north coast of Colombia, South

4    America, to various Central American countries with

5    the ultimate destination of the cocaine being the

6    United States.

7         The conspiracy alleges that the defendant,

8    with others, combined, conspired and agreed to

9    distribute cocaine, quote, "knowing and intending

10   that such substance would be unlawfully imported

11   into the United States," closed quote.

12        MR. WHITE:  Judge, I think that's a separate

13   conspiracy.  The cocaine that's alleged in the

14   indictment before you as you read on talks about --

15        THE COURT:  Well, that's a bit disingenuous,

16   it seems to me, Mr. White, because Mr. Ruddy is

17   going to tell you a lot more than I know about this

18   case.  All I'm doing is reading from the count to

19   which your client pled guilty.  And it alleges in

20   several instances that the cocaine was intended to

21   and was destined to be distributed into the United

22   States by way of importation.

23        MR. WHITE:  And, Judge, we --

24        THE COURT:  I don't know how you can argue

25   that your client didn't intend to import the cocaine

1    into the United States, when he pled guilty to that

2    very offense.

3         MR. WHITE:  And the cocaine in the indictment,

4    Your Honor, it's -- this is relevant conduct.  This

5    is other cocaine that was sent to a country and then

6    given to somebody to --

7         THE COURT:  I don't follow that.  Count One

8    doesn't charge a specific load, it just charges a

9    conspiracy in general; doesn't it?  From September

10   of 2000 through April of 2010 in the presentence

11   report outlines a number of different go-fast

12   vessels encompassed within the conspiracy.  So how

13   do you distinguish between different cocaine?

14        MR. WHITE:  Because the relevant conduct that

15   the government's using to support the enhancement is

16   not the actual conduct that you have before you.  I

17   think in this case there needs to be between -- and

18   in the cases that we've cited, the -- there was no

19   relevant conduct.  The facts were the facts.

20        In *Iacullo*, the facts were that the plane

21   brought the cocaine and was imported into the United

22   States.  And we knew exactly where it was going,

23   that it was brought into the United States, where it

24   was being distributed, where it was being housed,

25   which boat took it off, where it was taken off.

1    Here the government is relying on relevant conduct

2    to -- for the enhancement to apply, not --

3         THE COURT:  Well, let me ask you this.  What

4    difference does it make?  If it's relevant conduct,

5    he's accountable for it and it certainly can support

6    an enhancement.

7         MR. WHITE:  Because -- because the enhancement

8    is being applied too broadly.  It's -- the word

9    import has to have some meaning.  And not so much

10   import, import by an airplane.  I mean, this is an

11   airplane enhancement.

12        THE COURT:  Well, in the -- I'm not arguing

13   with you.  But by Socratic debate, if you will, in

14   the *Iacullo* case, the private plane was used several

15   times to pick up cocaine in Colombia and fly it into

16   the Bahamas, and then it was smuggled into the

17   United States by -- I believe by boat.  So that

18   court didn't require that the plane actually be used

19   to import into the territorial boundary of the

20   United States; did it?

21        MR. WHITE:  No.  But the court was clear on

22   the facts that an importation scheme had occurred,

23   that it was one shot, and that the same cocaine that

24   flew on the airplane was the exact same cocaine that

25   came to Florida.  I don't think you have that here.

1          THE COURT:  All right.  Mr. Ruddy, what's your

2     response?

3          MR. RUDDY:  Your Honor, I -- as you've noted,

4     the indictment charges general conspiracies which --

5     including some overt acts that are exclusively

6     maritime transportations of cocaine.  But it is not

7     limited -- would not be limited to that in any order

8     of proof, be it at trial or at this proceeding.

9          The cocaine that was subject -- used to obtain

10    the charging document was maritime transportation.

11    But this is the same transportation organization

12    using an alternative means of smuggling, in this

13    case private aircraft, to the same locales or venues

14    in which they smuggled by maritime conveyance.

15         To acknowledge that the cocaine for one type

16    of conveyance was to be brought into the United

17    States and was imported and not another is, I would

18    submit, inconsistent.

19         And he's acknowledged and admitted that the

20    cocaine that was imported by maritime conveyance was

21    imported to the United States.  I would submit that

22    that -- it's equally reasonable that the cocaine

23    imported to other countries by aircraft, private

24    aircraft was also imported into the United States.

25         THE COURT:  Well, that's the point Mr. White

 1    is making.  Do you have evidence that that's what

 2    occurred within this conspiracy?  It is your burden.

 3        MR. RUDDY:  Yes, Your Honor.  And Agent Cascio

 4    is here.

 5        THE COURT:  Well, it seems to me, and let me

 6    make sure Mr. White agrees, that the disputed issue

 7    of fact is whether or not the cocaine that the

 8    defendant has pled guilty to conspiring to

 9    distribute and import, evidence is lacking that that

10    cocaine was transported via a private aircraft as

11    part of the conspiratorial importation or conspiracy

12    to import.  Is that right, Mr. White?

13        MR. WHITE:  We're not denying that the cocaine

14    was -- the facts of the indictment, we're absolutely

15    not denying one fact whatsoever.

16        What I'm arguing is that the four instances

17    where an airplane transported the cocaine to Central

18    America and Haiti, then -- that a separate and

19    distinct drug trafficking organization then took the

20    cocaine and brought it to the United States.

21        We do not know how that occurred, the manner

22    in which it was done, when it was done or how it was

23    done.  That's the limited --

24        THE COURT:  I'm just not following that.

25        MR. WHITE:  Not this conspiracy, Your Honor.

1          THE COURT:  You're saying that these four

2    flights were a product of a separate conspiracy --

3          MR. WHITE:  No.

4          THE COURT:  -- than what he pled to?

5          MR. WHITE:  No.

6          THE COURT:  No?

7          MR. WHITE:  Well, Your Honor, it's -- it's a

8    conspiracy but, I mean, the acts -- I guess, I'm

9    trying to -- the acts of using the airplane on these

10   four occasions that brought cocaine to a -- to a

11   transshipment point were then sold there.  That's

12   the entire conspiracy.  And the marine conspiracy in

13   this case was the transshipment of drugs to Central

14   America which would eventually be imported into the

15   United States.

16         THE COURT:  So your position is that the four

17   flights that originated in Central America fall

18   outside the conspiracy that he has pled guilty to?

19         MR. WHITE:  A different conspiracy in the

20   sense that they were done in a different manner.

21   Correct.

22         THE COURT:  All right.  Mr. Ruddy, call your

23   first witness.

24         COURTROOM DEPUTY CLERK:  Please raise your

25   right hand.

1              (Witness complied.)

2              COURTROOM DEPUTY CLERK:  Do you swear or

3      affirm the testimony that you give in this case will

4      be the truth, the whole truth and nothing but the

5      truth?

6              THE WITNESS:  I do.

7              COURTROOM DEPUTY CLERK:  Please be seated.

8              (Witness complied.)

9              COURTROOM DEPUTY CLERK:  Please state your

10     name and spell your last name for the record.

11             THE WITNESS:  Christopher Scott Cascio,

12     C-a-s-c-i-o.  Good morning.

13                    DIRECT EXAMINATION

14     BY MR. RUDDY:

15     Q     And you're employed by whom?

16     A     The Department of Justice, DEA.

17     Q     And for how long?

18     A     A little over 12 years.

19     Q     And your current assignment?

20     A     I'm currently assigned to Operation Panama

21     Express in Tampa, Florida.

22     Q     And how long have you been assigned to that

23     operation?

24     A     A little over seven years.

25     Q     Did you participate in an investigation of the

1    defendant here, Luis Caicedo-Velandia?

2    A    Yes, I did.

3    Q    And you're the case agent?

4    A    Yes, sir.

5    Q    There are other agents involved, but you are

6    the primary agent?

7    A    Yes, sir.

8    Q    And did you investigate Mr. Caicedo-Velandia

9    prior to 2008?

10   A    Yes.

11   Q    And was an indictment returned in that year?

12   A    Yes.

13   Q    And was a subsequent superseding indictment

14   obtained in the year 2010?

15   A    Yes.

16   Q    And did you participate in the facts of that

17   investigation?

18   A    Yes, I did.

19   Q    And that information dealt with what kind of

20   smuggling activity?

21   A    Cocaine smuggling.

22   Q    And by what means or conveyance was used?

23   A    Maritime.

24   Q    Okay.  And subsequent to -- prior to the

25   superseding indictment and subsequent to that, did

1    you also learn of investigations in other venues in

2    the United States?

3    A      Yes.

4    Q      And what venues were that -- was that?

5    A      Eastern District of New York.

6    Q      And that involved what type of witness or

7    witnesses?

8    A      Other witnesses involving the chief security

9    officer and the chief financial officer and the

10   alleged partner of Caicedo in Mexico.

11   Q      Okay.  And what timeframe, months and years,

12   did that -- did you obtain that information?

13   A      I obtained the information beginning around

14   2009.

15   Q      Okay.  And Mr. Caicedo was arrested in the

16   spring of 2010; is that correct?

17   A      Yes, sir.

18   Q      And he was extradited to the Middle District

19   of Florida in July of last year; is that correct?

20   A      That's correct.

21   Q      During that time, prior to you having any

22   contact with Mr. Caicedo, did you learn of the

23   information possessed by these witnesses that were

24   being used in the Eastern District of New York

25   investigation?

1    A    Yes.

2    Q    Okay.  And that involved what kind of

3    activity?

4    A    Different methods or conveyances of smuggling

5    cocaine.

6    Q    Such as?

7    A    Semi-submersible methods, airplanes, cargo,

8    vessels and land transportation organizations

9    involved in the Caicedo organization.

10   Q    Okay.  And the -- you mentioned two particular

11   witnesses at least in terms of their

12   responsibilities.

13   A    Yes, sir.

14   Q    The chief financial officer?

15   A    Yes.

16   Q    Or accountant --

17   A    Yes.

18   Q    -- generally.  And a chief of security?

19   A    Yes.

20   Q    Did you personally interview both of those

21   people?

22   A    Yes, I have.

23   Q    And did they describe to you the manner in

24   which cocaine was smuggled by this organization?

25   A    Yes.

1    Q      And did they talk about different types of

2    conveyances that were used?

3    A      Yes, they did.

4    Q      What types of conveyances did they say were

5    used?

6    A      They affirmed the information that we had in

7    the investigation that semi-submersible conveyances,

8    cargo ships, cargo vessels, airplanes and maritime

9    transportation of the vessels.

10   Q      When you interviewed these people, did they

11   make any distinction between the types of

12   conveyances that were used?

13   A      No.

14   Q      Did they indicate to you where this cocaine

15   was intended for, ultimate destination?

16   A      Yes.

17   Q      And where?

18   A      Ultimately it was either going to be delivered

19   through Venezuela to Europe or through Venezuela to

20   Mexico, ultimately to the United States.

21   Q      Okay.  And was that by what type of

22   conveyance?

23   A      Depending.  They moved cocaine in all of those

24   conveyances to the different countries.  And if the

25   cocaine -- I had information from the defendants

1    that some of the cocaine was flown to Mexico and

2    then moved from Mexico into the United States.

3    Q      And did they -- did these individuals indicate

4    to you whether this was common knowledge in the

5    organization?

6    A      Yes.

7    Q      And did they confirm that, in fact, cocaine

8    was smuggled by airplane from Venezuela to Mexico

9    and imported into the United States in this

10   investigation?

11   A      Yes.

12   Q      For this organization?

13   A      Yes.

14   Q      Once or multiple times?

15   A      Multiple times.

16   Q      Who was the head of the organization?

17   A      Mr. Caicedo.

18   Q      Now, you indicated that these witnesses talked

19   about some cocaine going to the United States?

20   A      Yes.

21   Q      Was there another ultimate destination for

22   some of the cocaine?

23   A      Yes, Europe.

24   Q      Okay.  And did they make that distinction?

25   A      Yes.

1    Q      Were airplanes used to smuggle cocaine to

2    Europe?

3    A      Yes.

4    Q      On one or multiple occasions?

5    A      Multiple occasions.

6    Q      And these types of aircraft, were they

7    commercial aircraft?

8    A      No, sir, private aircraft.

9    Q      Private.  Okay.  All right.  Now, you talked

10   about Venezuela to Mexico, that was one route?

11   A      Yes.

12   Q      And were there other routes used?

13   A      Other routes would be from Colombia to Mexico,

14   Colombia to Haiti, and Venezuela to Mexico.

15   Q      Okay.  And we're talking strictly about

16   airplanes here?

17   A      Yes.

18   Q      Those were the routes that were used by air

19   traffic?

20   A      Yes.

21   Q      Noncommercial?

22   A      Yes.

23   Q      In all instances?

24   A      In the instances that were explained to me by

25   the individuals that I spoke to in this

1      investigation.

2      Q      Okay.  And that would be the chief financial

3      officer, the accountant, and the head of security?

4      A      And other individuals in the investigation.

5      Yes.

6      Q      Beyond them?

7      A      Yes.

8      Q      Now, the -- you talked to the chief financial

9      officer?

10     A      Yes.

11     Q      Did he indicate to you what the method of

12     payment was for the cocaine that was distributed and

13     imported into the United States?

14     A      Yes, he did.

15     Q      Tell us.

16     A      U.S. dollars.

17     Q      And to Europe?

18     A      Euros.

19     Q      Euros.  Okay.  Nothing further.

20            THE COURT:  Cross-examination.

21            MR. BROWN:  Thank you, Your Honor.

22                          CROSS-EXAMINATION

23     BY MR. BROWN:

24     Q      Good afternoon, Agent.

25     A      Good afternoon.

1   Q      All right.  The -- you would agree with me

2   that the indictment charges what is termed as

3   maritime cocaine transportation; correct?

4   A      Yes.

5   Q      Okay.  And, in fact, after you get past the

6   first paragraph, there's a line in there on

7   paragraph seven, page three, that again talks about

8   transporting cocaine by maritime vessels from the

9   coast of South America to Mexico and ultimately to

10  the United States?

11  A      I'll take your word for it.  You're looking at

12  the indictment.

13  Q      All right.  Now, outside of this indictment,

14  though, I think what you're testifying to is that

15  there was information that aircraft carrier --

16  aircraft planes were used?

17  A      Yes.

18  Q      All right.  And when we're talking about

19  aircraft, we're talking about noncommercial

20  aircraft?

21  A      Yes.

22  Q      All right.  And as far as I understand the

23  testimony, these aircraft were used to transport

24  cocaine from one South American country to another,

25  or perhaps the Caribbean or the Bahamas or Haiti?

1    A      Haiti, Mexico, yes.

2    Q      Okay.  Now, were you aware of any of these

3    airplanes, again, using that definition, the

4    noncommercial, that flew the cocaine into the United

5    States?

6    A      No.

7    Q      All right.  So all of the flights that we're

8    talking about are not importing into the U.S. but

9    actually importing it from one country into another

10   outside of the U.S.?

11   A      That's correct.

12   Q      All right.  Those transport -- that importing

13   or transporting of the cocaine, it's your testimony

14   that that was a part of his organization; is that

15   right?

16   A      Yes.

17   Q      All right.  Now, you said that the cocaine

18   was -- ultimately ended up into the United States.

19   But was it his organization that was ultimately

20   responsible for that?  Through the aircraft is what

21   I'm talking about.

22   A      No.

23   Q      All right.  He -- what we're talking about is

24   his organization selling it to another organization

25   and perhaps another country?

1    A    That's not clear to me.  It might be

2    coconspirators of his, of the organization or two

3    organizations merging.

4    Q    Okay.  So -- but we don't know the answer to

5    that today?

6    A    That's correct.

7    Q    All right.  All we know -- strike that.

8         Okay.  So it could possibly be two

9    organizations merging, it could be one organization

10   selling it to another?

11   A    Right.

12   Q    However, it wasn't his organization that was,

13   as far as you know, responsible for then importing

14   it into the U.S.?

15   A    That's correct.

16   Q    Okay.

17        MR. BROWN:  Nothing further, then, Judge.

18        THE COURT:  Redirect?

19                    REDIRECT EXAMINATION

20   BY MR. RUDDY:

21   Q    The accountant, -- was the accountant able to

22   delineate which loads were smuggled by aircraft?

23   A    Yes, he was.

24   Q    Did he indicate whether those were successful?

25   A    Yes, he did.

1    Q      Okay.  In every instance?

2    A      No.

3    Q      Some were unsuccessful?

4    A      Yes.

5    Q      Okay.

6           MR. RUDDY:  Nothing further, Your Honor.

7           THE COURT:  Thank you, sir.  You may step

8    down.  Watch your step, please.

9           Next witness, please.

10          MR. RUDDY:  No further witnesses, Your Honor.

11          THE COURT:  Any witnesses from the defense,

12   Mr. White?

13          MR. WHITE:  No, Your Honor.

14          THE COURT:  All right.  Mr. Ruddy, argument.

15          MR. RUDDY:  Your Honor, I'd draw to the

16   Court's attention paragraph eight of the superseding

17   indictment on page three.  It states, "It was

18   further part of the conspiracy that members of the

19   conspiracy would and did explore, utilize and

20   attempt to utilize various smuggling methods and

21   transportation routes to facilitate the smuggling

22   and distribution of cocaine."

23          I would submit that that, at least in that

24   aspect, deals with the limiting or unlimiting of the

25   alleged proof to purely maritime transportation.

1          THE COURT:  What is your response to the

2     contention that the defendant was and his

3     organization was responsible for bringing the

4     cocaine from Central America to Haiti, for example,

5     and then a different organization actually imported

6     it?  Meaning, of course, across the territorial

7     jurisdiction of the United States.

8          MR. RUDDY:  Yes, sir.  I believe the *Iacullo*,

9     and I maybe mispronouncing that case, deals -- deals

10    with that, Your Honor.  Mr. -- the defendant,

11    *Iacullo*, was a pilot whose responsibility began and

12    ended with transporting -- flying the cocaine from

13    Colombia to the Bahamas, and he was paid for that.

14         His role and participation and involvement in

15    the importation enterprise ended at that point in

16    time.  Yet he is enhanced for use of the private

17    aircraft because the cocaine was subsequently

18    imported into the United States by a maritime

19    conveyance.

20         So I would submit, Your Honor, at least if

21    we're going to rely on the authority from the

22    admittedly unpublished case, *Iacullo*, that is not --

23    not a factual distinction from the *Iacullo* case or

24    holding that the Eleventh Circuit made there.

25         THE COURT:  All right.  Thank you.  Mr. White.

1     Mr. Brown is getting nervous because he knows what

2     I'm about to tell him.

3          MR. BROWN:  Well, Your Honor, there is a

4     distinction in that case, though.

5          THE COURT:  Well, I'm talking about the

6     lawyers.

7          MR. BROWN:  Okay.

8          THE COURT:  But go ahead.  I'm going to let

9     you.  You'll be jumping up and down if you don't get

10    to talk, so go ahead.

11         MR. BROWN:  Well, there is a distinction,

12    though, with that case.

13         THE COURT:  What is the distinction?  I'm

14    serious.

15         MR. BROWN:  I know.

16         THE COURT:  I don't see it.

17         MR. BROWN:  Well, on page -- my page four of

18    that.

19         THE COURT:  Of the Eleventh Circuit case?

20         MR. BROWN:  Yes, *Iacullo*.

21         THE COURT:  All right.

22         MR. BROWN:  That begins with, according to the

23    presentence investigation report, the conspiracy

24    involved the importation of the cocaine from

25    Colombia through the Bahamas then into Florida.

1      That's one conspiracy.

2           THE COURT:  Let me find that.

3           MR. BROWN:  Okay.

4           THE COURT:  That's page four?

5           MR. BROWN:  I have it on page four.  It's a

6      Westlaw printout so --

7           THE COURT:  Do you see maybe a headnote I

8      could find that particular --

9           MR. RUDDY:  What does it say, according to the

10     plea --

11          MR. BROWN:  Yeah.  Do you see that in a

12     headnote, according to --

13          THE COURT:  In the plea agreement, *Iacullo*

14     agreed to plead guilty to Count One, is that it?

15     No, that's not.

16          MR. RUDDY:  Your Honor, it would be page -- it

17     would be page two on the Westlaw printout, if that's

18     what you used.

19          THE COURT:  My page two just has all the

20     headnotes so --

21          MR. RUDDY:  No, page two of the body of the

22     opinion, Judge.

23          THE COURT:  All right.  I got you.  Star start

24     two, according to the presentence investigation?

25          MR. BROWN:  Right.

1          THE COURT:  All right.  Go ahead, Mr. Brown.

2          MR. BROWN:  And it talks about that the

3     conspiracy involved the importation of multi

4     kilogram quantities of cocaine from Colombia through

5     the Bahamas and into Florida by using various

6     private aircraft.  That's -- that's what he was

7     charged with, that's what the conspiracy was.  And I

8     think he pled to those.

9          THE COURT:  That's what our presentence report

10    says; isn't it?

11         MR. BROWN:  Well, it does -- it doesn't,

12    really.  Our presentence report talks about maritime

13    importation.  What the government is --

14         THE COURT:  Well, paragraph 17 pretty much

15    spells out that noncommercial aircraft was used to

16    move cocaine from Colombia to Guatemala and to

17    Haiti.

18         MR. BROWN:  Right, ultimately used.  In other

19    words -- all right.

20         THE COURT:  It doesn't say ultimately, it says

21    specifically used.  We can't rely on what the

22    presentence report -- it may be accurate.  But what

23    you're to look at is the indictment.

24         MR. BROWN:  Right.  And the indictment charges

25    a maritime, and it breaks it down to specific --

1      also specific offenses.  The government then says

2      under relevant conduct, there's information that an

3      aircraft was used and the enhancement should apply.

4           If it's only a question of using private

5      aircraft to import or export cocaine anywhere, then

6      I would -- I think we agree with them.  If it's

7      just a question of sometimes there being an aircraft

8      used, that's -- then we agree.

9           What it does, though, that meaning means

10     there's no reason for using the word import/export.

11     If that's how you're supposed to define it, then why

12     even use the words?  All you need to do is say, if

13     an aircraft was used that's noncommercial, the

14     enhancement applies.

15          But the enhancement doesn't say that.  It does

16     use the term import/export.  And I think the case

17     law is saying that it's either the charged

18     conspiracy or you have to prove that it was imported

19     through aircraft into the U.S.  Otherwise, it means

20     nothing.  You might as well just say if you used at

21     any point in time a noncommercial aircraft, the

22     enhancement applies.

23          So our distinction is we're agreeing that a

24     noncommercial aircraft was used to transport cocaine

25     in other countries.  All right.  Not by his

1    organization into the U.S., and there's no

2    information of his organization using a plane into

3    the U.S.

4         But if that's all the enhancement needs, in

5    other words, if you don't really have to worry about

6    importing or exporting into the U.S., if it's

7    strictly the use of a noncommercial plane anywhere,

8    then the government is right and the enhancement

9    applies.

10         We believe, though, that the word

11    import/export means import into the U.S.  This

12    conspiracy didn't charge import by aircraft into the

13    U.S.  Their argument is, well, we know of four

14    instances under relevant conduct where another

15    organization did it, but you sold the cocaine to

16    them, or we're not sure whether you even partnered

17    with them.

18         I would argue that that's not enough.  That's

19    not what the enhancement applies to.  Otherwise, all

20    cocaine would be applicable.  I mean, anytime you

21    use an aircraft, you would apply this.  I mean,

22    cocaine only grows in Colombia -- well, that's one

23    of the only places it's grown.  I know the agent

24    here would disagree with that.

25         So I think that you have to look at the word

1    import/export and define a meaning to that, which is

2    what the case law has done.  And it means -- I

3    submit that it means import into the U.S.

4        But if this Court wants to find that the use

5    of a small plane from, say, Colombia to Haiti or

6    some other country with his organization is

7    sufficient and then he's really liable for what that

8    organization ultimately does with it, then the

9    enhancement would apply.  I just don't think that's

10   what the enhancement speaks about.

11       (Brief pause.)

12       THE COURT:  The unpublished decision of *United*

13   *States versus Iacullo*, reported at 140 Fd. Appx. 94

14   supports the government's position.  Notwithstanding

15   it is unpublished, it is precedent from this

16   circuit, which I choose to follow.

17       I don't see any meaningful distinction between

18   the cases.  In discussing the application of

19   2D1.1(b)(2)(A), the panel noted that, it was

20   undisputed that the private plane was used several

21   times to pick up cocaine in Colombia and fly it to

22   the Bahamas while the cocaine was en route to this

23   country, pointing out further that it was not

24   disputed that a private plane was used to move

25   cocaine from Colombia to Mayaguana Island, where it

1    was then placed on a vessel to smuggle into Florida.

2         Reading from the opinion, quote, "On this

3    record it is clear that a private plane was used

4    within the meaning of Section 2D1.1(b)(2)(A) during

5    the importation scheme of which *Iacullo* was an

6    active participant.  Thus, the district court did

7    not err in assessing the two-level enhancement."

8         I will overrule the defendant's objections

9    based on the undisputed facts that have been

10   established through the testimony of the agent that

11   the cocaine destined for the United States while en

12   route was transported by private aircraft between

13   Central America and Haiti; therefore, the two-level

14   enhancement is appropriate because a private plane

15   was used.

16        I understand the defendant's argument.

17   Certainly, one might argue, and I think the

18   defendant has in good faith, that the plain reading

19   of the subsection would support the conclusion that

20   the government must show that the nonscheduled

21   commercial air carrier was used to import or export

22   the controlled substance.

23        On the other hand, the Eleventh Circuit has

24   not read that language consistent with the

25   defendant's position and, in fact, has read it

1          contrary to that argument.

2               I would note that subsection A referring to

3          the regularly scheduled commercial air carrier, that

4          is, the private plane, was then followed by a

5          reference to a submersible vessel or a

6          semi-submersible vessel -- it's hard getting this

7          out -- a submersible vessel or semi-submersible

8          vessel as described in 18 USC Section 2285 was used.

9               It would seem to me that if that entire

10         provision is read in the context of the two-level

11         enhancement, whether by use of a private airplane, a

12         semi-submersible or submersible vessel, or the

13         defendant acted as a pilot, copilot, captain,

14         navigator, flight officer, etcetera, aboard any

15         craft or vessel carrying a controlled substance,

16         read in the context of what was intended, the use of

17         a private plane as part of the scheme at any point

18         from origin to actual importation supports the

19         enhancement, and that's how I'm going to rule,

20         consistent with the Eleventh Circuit decision.

21              That it may be relevant conduct as opposed to

22         charged conduct is of no moment.  Although I'm not

23         necessarily finding that, because as I read the

24         indictment, the superseding indictment of the manner

25         and means on page three, as Mr. Ruddy points out,

```
 1          immediately after the reference to transporting

 2          cocaine by maritime vessels from the coast of South

 3          America to Mexico and ultimately to the United

 4          States, the grand jury alleged that it was further

 5          part of the conspiracy that the conspirators would

 6          and did explore, utilize and attempt to utilize

 7          various smuggling methods and transportation routes

 8          to facilitate the smuggling and distribution of

 9          cocaine.

10               That broad characterization of various

11          smuggling methods necessarily might include

12          semi-submersibles, private aircraft, cargo ships,

13          cargo containers, etcetera.

14               Are there any other objections to the

15          application of the advisory guidelines, Mr. White?

16               MR. WHITE:  No, Your Honor.

17               THE COURT:  Let me then determine the advisory

18          guidelines, subject, of course, to the government's

19          motion under 5K2.1, which we'll take up in a moment.

20               Let me ask the interpreter, before I say

21          anything else, are you having any difficulty hearing

22          me or any of the lawyers?

23               THE INTERPRETER:  No, Your Honor, so far.

24               THE COURT:  Because we have a new sound system

25          that we're all getting used to.  This new sound
```

1    system that we're all getting used to requires that

2    we stay within a very small cone of the mic, unlike

3    the old system.  It's supposed to be better, but be

4    aware, you need to be close by.

5         The advisory guidelines, then, based on the

6    undisputed facts and the facts I have now resolved

7    are as follows:

8         We have a total offense level of 43, with a

9    criminal history category Roman Numeral I.  Under

10   the advisory guidelines, that results in an advisory

11   term of life in prison, followed by five years of

12   supervised release as to Counts One, Two, Four and

13   Five; three to five years as to Count Three; a fine

14   range of $25,000 to $18 million, and a 500-dollar

15   special assessment.

16        Mr. Ruddy, your motion, docket number 58.

17        MR. RUDDY:  Yes, sir.  Your Honor, first of

18   all, I would like to make this motion not only

19   pursuant to 5K1.1, but Title 18 United States Code,

20   Section 3553(e).  The -- as you know from document

21   number 58, we are making a motion with a recommended

22   departure of eight levels.

23        As you'll know from your experience on the

24   bench here, this degree of recommended departure

25   are -- is rare.  An eight-level departure is

1    significant.  And Mr. Caicedo-Velandia's cooperation

2    has been significant.

3        He -- he has been debriefed by Agent Cascio

4    countless times and other agents in the Eastern

5    District of New York, Mexico City, Bogota, Colombia

6    and elsewhere, numerous, numerous times.  The

7    defendant has -- has done, to the extent that could

8    be assessed by myself and especially Agent Cascio,

9    everything possible within his power to provide

10    truthful, accurate and complete information.

11        His memory, Your Honor, is beyond excellent.

12    He has a detailed recollection of events and people,

13    but is also willing to admit when he is not

14    completely certain of what occurred in a particular

15    event within -- with precision.

16        So what he provides us is information that he

17    knows and to the degree and extent he can recall it,

18    which is of vital importance in relying on that

19    information going forward in an investigation.

20        Mr. Caicedo-Velandia has provided information,

21    Your Honor, that has resulted in a number of

22    indictments, most of which are sealed, both here and

23    in the Eastern District of New York.  One case, Your

24    Honor, I prefer not to give the names because of the

25    sealed indictments.

1          Obviously, security of -- of

2    Mr. Caicedo-Velandia is of primary concern for

3    obviously himself and his family, but for the

4    government, as well.  I don't believe there are any

5    media individuals in the courtroom here today.  But

6    as you know, these proceedings are not sealed, so

7    I'm just going to give you the general description

8    of the type of case and trafficker involved.

9          One instance -- one indictment here in the

10   Middle District of Florida, Your Honor, involves

11   a -- what we refer to as a CPOT, consolidated

12   priority organization target.  That's the highest

13   designation of trafficker in the Justice Department.

14   And that individual was apprehended and is pending

15   extradition to Tampa, Florida.

16         Mr. Caicedo-Velandia detailed extensive

17   dealings with this individual; as I recall,

18   acknowledged sending 30 tons of cocaine to this

19   individual throughout the course of his dealings

20   with him.  And his information was used to indict

21   that individual.  And we make this motion on the --

22   with the understanding that he will continue to

23   cooperate down the road in the event that this

24   particular individual is extradited successfully to

25   Tampa, Florida.

1          There's a second case that involves a number

2     of individuals in Colombia that are probably the

3     most significant narcotics money laundering

4     individuals in Colombia.  They deal in the --

5     literally the hundreds of millions if not billions

6     of dollars in drug proceeds.

7          Mr. Caicedo-Velandia provided information

8     against those individuals that were utilized -- that

9     was utilized to return an indictment against those

10    individuals.  Those individuals are also in custody

11    in Colombia and pending extradition to here in

12    Tampa, Florida.

13         There were three individuals, two separate

14    cases in the Eastern District of New York that were

15    indicted based upon Mr. Caicedo-Velandia's

16    cooperation.  His information, to the extent I'm

17    aware, these are -- these are similarly -- similar

18    caliber traffickers, Your Honor, to the first two

19    that I've mentioned here today.  These are high

20    level -- high level targets and high level

21    traffickers.

22         The defendant, again, his information was used

23    to indict those people.  And I'm unaware of their

24    status, Your Honor, if they have been apprehended

25    and are pending jurisdiction or not.  But in any

1    event, I'm assuming that they -- those indictments

2    are sealed, as well.  I'm virtually certain that

3    they are.

4         But that -- in terms of indicted cases in

5    which the defendant has cooperated and that resulted

6    in those indictments, that -- that completes that

7    aspect of his cooperation.

8         He has also cooperated in an already indicted

9    case involving a fugitive that is in Mexico out of

10   the Middle District of Florida here, and has

11   provided information in -- against that individual.

12   That individual is also a CPOT level target.

13        The defendant had provided information that

14   ultimately resulted in a seizure -- derivatively in

15   a seizure of 200 kilograms of liquid cocaine in the

16   Caribbean, and in another instance a go-fast vessel

17   carrying 475 kilograms of cocaine.  He is -- he's

18   cooperating in other investigations that may result

19   in indictments in the future.

20        Your Honor, the defendant has voluntarily

21   identified, located and surrendered over -- over a

22   hundred and -- almost $115 million in cash.  He has

23   in the year that he's been in custody here turned

24   over $104 million in drug proceeds in Colombia.  And

25   that -- that money was forfeited by the government

1          of Colombia.

2                There was an additional $9 million which

3          was -- Mr. Caicedo-Velandia located in another

4          country in Central America and the -- totaling

5          approximately nine million, and the majority of that

6          money was brought to Tampa.  Because of the

7          agreements with the country in which that money was

8          seized, we were permitted to take that -- return

9          those funds to the -- to the United States, to

10         Tampa.

11               Now, the Middle District of Florida has never

12         read nor do I believe the Eleventh Circuit has ever

13         applied forfeitures of illegal proceeds,

14         particularly of the criminal conduct from which

15         the -- a defendant was charged can be used for -- to

16         qualify for substantial assistance.  It is not used

17         in the prosecution of another person.

18               So I mention that while I make this motion,

19         not to the idea that it not be factored into our --

20         our recommendation, but to help demonstrate to you

21         essentially two things, one good, one bad; that the

22         defendant has done everything possible to cooperate,

23         that's the good part.

24               The bad part is essentially what he did, he

25         forfeited what he had in accounts receivable.  This

1    was money that was out there in the stream of

2    commerce that had not been turned over to his

3    accountant in his drug organization.

4         It shows the -- the level of trafficker that

5    he is, but it also shows the level of cooperation he

6    can provide to the government in other individuals

7    at the level in which he dealt.

8         We make that motion for eight levels, Your

9    Honor.  I believe that, as I said, that's a -- we

10   don't make those kind of recommendations often.  And

11   unless you have any questions, I have nothing

12   further.

13        THE COURT:  No.  I'm pondering, however -- I

14   apologize.  I don't necessarily have a question, but

15   I'm pondering the recommendation in an unrelated

16   case but of equally significant proportion in terms

17   of international drug trafficking that I presided

18   over the week before last.

19        I don't know that you're familiar with the

20   case, but there was a 12-level recommendation.  And,

21   certainly, it's the prerogative of the United States

22   Attorney's Office to determine the appropriate

23   recommendation.  But I just wondered.  There may be

24   substantial differences between the two cases that I

25   would not be aware of.  Do you know of the case I'm

1     speaking?

2          MR. RUDDY:  If you'd give me the name.

3          THE COURT:  It was a guy from Colombia.

4     Actually, two brothers.  Ms. Chapa-Lopez was the

5     prosecutor.

6          MR. RUDDY:  Two brothers?

7          THE COURT:  Yes.

8          MR. RUDDY:  Angel Caicedo-Cabaleiro?

9          THE COURT:  Yes.

10          MR. RUDDY:  I'm familiar with that, Your

11     Honor.  That --

12          THE COURT:  That may not be fair to ask.

13          MR. RUDDY:  Yes, sir.

14          THE COURT:  But you asked if I had questions.

15     I just wondered.

16          MR. RUDDY:  Yes, sir.  That is a -- that is a

17     significant -- I am familiar with that and that is a

18     significant cooperator.  The -- at some point, Your

19     Honor, these levels of trafficker -- traffickers are

20     not contemplated by the sentencing guidelines, they

21     are so far off the charts.

22          I mean, this is a million kilos of cocaine

23     that this man's involved with.  This is four to five

24     billion dollars in drug proceeds.  This is -- the

25     Sentencing Commission could not contemplate this

1       level of trafficker.

2             At least -- and what we try to do is evaluate

3       the level of trafficker, the degree of cooperation

4       that he has done, and couple that with what he's

5       being held accountable for in terms of the

6       sentencing guidelines, and make an appropriate

7       recommendation.

8             Now, Mr. Caicedo-Cabaleiro is -- he was shot,

9       injured, as you know.  He still has, I believe,

10      serious facial injuries as a result of that.  His

11      cooperation was delayed for years, as you well know.

12      And to the extent of completion of his cooperation,

13      Mr. Caicedo-Cabaleiro is much farther down the road

14      than this defendant here.

15            This defendant has only been here one year.

16      Sounds like a long time.  But in the scheme of

17      things of his cooperation, that's the first lap of a

18      multi-mile race.  He's got a long way to go.

19            THE COURT:  I take it from that comment that

20      you may very well be back before the Court in the

21      future?

22            MR. RUDDY:  Absolutely, Your Honor.

23            THE COURT:  All right.  Well, I think you

24      answered the question, not that you can draw many

25      comparisons.  But you asked if I had a question, I

1      certainly had one at least in my mind, although I'm

2      not questioning the assessment of the government, by

3      any means.

4           MR. RUDDY:  Yes, Your Honor.

5           THE COURT:  Is there a response from the

6      defense?

7           MR. WHITE:  Yes, Your Honor, if I can be

8      allowed to mention some additional matters not

9      brought up by Mr. Ruddy, and also if Mr. Brown can

10     be allowed to speak after I state to the Court the

11     additional matters.

12          Your Honor, the cooperation in this case

13     actually starts in Argentina.  When I flew down to

14     Argentina and met with my client on the first

15     occasion, he immediately consented to extradition

16     and he expressed his intention to cooperate.

17          Your Honor, when we talk about the money, and

18     I do have arguments why it does fit under a 5K1

19     analysis, the money was a law enforcement operation.

20     This was something that was not just surrendered in

21     Colombia over the course of a day.  This was a

22     three-month law enforcement investigation headed by

23     Agent Cascio and ICE agents down in Colombia.

24          The person responsible for doing that was Juan

25     Caicedo-Velandia, who is my client's brother.  He

1    had an arrest warrant pending.  My client was able

2    to speak to him and tell him this is what needed to

3    be done.

4          Mr. -- my client then had to send messages to

5    various money movers within Colombia to tell them

6    that they must give back this money to Juan

7    Caicedo-Velandia, the brother.

8          The money was kept in all different areas

9    throughout Colombia.  And what happened is Juan

10   Caicedo-Velandia would put money in a car.  That

11   money would then be driven to a parking lot.

12   Mr. Caicedo, the brother, would then call his

13   attorney, Luis Gerra, who would then call law

14   enforcement.  Law enforcement would then come and

15   seize the car.

16         That happened on three separate occasions,

17   totaling approximately $52 million.  And it was a

18   very dangerous operation because eventually press

19   releases were circulating in Colombia that

20   Caicedo-Velandia was giving back money.

21         I can't tell you how dangerous it can be in

22   Colombia when someone knows that you have a

23   tremendous amount of money.  The danger comes from

24   all over.  It comes from corrupt police officers --

25   Mr. -- the brother had a warrant, they were looking

1    to arrest him.  It also comes from criminal gangs.

2    And what they're trying to do is kidnap, hold them

3    for ransom and get to the money.

4         There was also an additional money drop in an

5    abandoned apartment in the same fashion, Your Honor.

6    Approximately $52 million was put in an apartment.

7    Then the brother would call his attorney.  His

8    attorney would then call law enforcement, and the

9    seizure would take place in the apartment.

10        The -- once the press releases got out and

11   circulated, my client's family had to immediately

12   leave to Panama.  They didn't have time to even get

13   paroled into the United States.  My client's family

14   went to Panama for safe haven, and eventually,

15   thanks to the U.S. government, were paroled into the

16   country.

17        The threats and the -- and the risk of being

18   kidnapped was so great that the brother had to leave

19   the country.  From one day to the next, it was just

20   everywhere in the news, and there were just so many

21   people hunting him, hunting him.

22        Now, in Panama there was also an operation.

23   The danger factor wasn't as great.  But there was

24   also a situation where my client had to send a

25   message down to individuals in Panama that were

1    holding the money to release those funds to Agent

2    Cascio and his Pan Ex agents, and that was done.

3    And $9 million was brought here to the United

4    States.

5         The $104 million could not, because by

6    international law, even though the money was

7    actually given to U.S. law enforcement, it had to

8    stay in Colombia.

9         So, Your Honor, I think the Court can legally

10   consider my client's surrender of drug proceeds as a

11   form of cooperation in addition to a variance.  And

12   it can do so by looking at the language of 5K1.

13   Contrary to what Mr. Ruddy may say, I do think

14   substantial assistance is defined as assisting in

15   the investigation and prosecution of another person.

16        Now, Your Honor, at the time that these money

17   surrenders were taking place, Julio Lozano, who was

18   my client's partner, was a fugitive at justice --

19   was a fugitive.  He had an arrest warrant.  We had

20   tried to encourage him to come in.  He did not want

21   to come in.  He was hiding.  He was wanted.

22        So while these money surrenders were taking

23   place, his codefendant was a fugitive.  So my

24   argument is that the surrendering of the money

25   provided direct evidence of his codefendant's money

1     laundering operations.

2          I also think it can also be considered as the

3     voluntary disclosure of the crime of another other

4     than the defendant, which is outlined in 5K2.16.

5     Also, Your Honor, 5K1.1(a)(4) directs the court to

6     consider any danger or risk or risk of injury to the

7     defendant or his family.

8          Again, what Mr. -- what his brother did was

9     extremely dangerous.  The family had to be -- had to

10    leave the country.  And thank God, nobody got hurt.

11         Your Honor, I would agree with Mr. Ruddy on

12    the two individuals that my client's information was

13    used to indict the two defendants.  One being a

14    significant target, as he said, a major drug

15    transporter; the other one being another major

16    transporter.

17         Your Honor, there was another case where my

18    client identified this individual to law enforcement

19    and then made recorded phone calls.  And this was

20    done from the Pinellas County jail.  This was a

21    money mover, someone who moved money in containers

22    for the organization.

23         Two recorded phone calls were made to this

24    individual where he confessed, he admitted in a

25    conversation with my client to moving currency for

1     the organization.  That individual called Agent

2     Cascio two weeks later and said, when can we meet.

3          He hired a United States defense attorney.  A

4     meeting took place with Agent Cascio and his

5     attorney.  And I suspect, I don't know the details,

6     I suspect that he will soon be surrendering to

7     charges.

8          Your Honor, again, what Mr. Ruddy said about

9     the CPOT defendant is a hundred percent accurate.

10    And he will be a witness in the case once this

11    defendant does come here.  This is a very

12    significant trafficker.

13         Your Honor, also what I think is very

14    important, AUSA Bonnie Clapper, who is the AUSA

15    handling the money laundering prosecution of this

16    case in New York, provided 246 nicknames of various

17    individuals who did business with and for my

18    client's drug trafficking organization.  We're

19    talking about cocaine producers, distributors,

20    transporters, both in the Pacific, the Caribbean and

21    land transporters.

22         As you can imagine, for law enforcement to

23    secure an indictment, a target must be identified.

24    My client was able to assist law enforcement in

25    converting 126 of those nicknames, talking about

1        Jose Peppe Carlos, into an actual real name.  This

2        saved law enforcement a tremendous amount of time.

3        Additional individuals were also named, as well.

4              Your Honor, there was a fugitive from justice.

5        This was an individual who had been arrested, placed

6        bond -- set bond and fled the United States to

7        Colombia.  He had assumed a new identity in

8        Colombia.  This was a case that was being prosecuted

9        in the Southern District of Florida.

10             This person -- my client knew his location,

11       knew that he was a fugitive, knew that he escaped

12       from federal courts here in Florida.  He was able to

13       provide law enforcement with the real name and

14       the -- the fake name and the real name.  Law

15       enforcement was able to confirm that that was the

16       same person.  My client gave the exact location

17       where this individual was hiding.

18             I contacted the Assistant United States

19       Attorney handling the matter.  I said, this man is

20       here, it's your case.  They -- apparently, because

21       so much time had passed, they declined prosecution

22       because they had witness problems, some of the

23       cooperating defendants had been released from

24       prison.

25             Your Honor, we've also provided the location

1    of two wanted individuals.  One was an indicted

2    individual with a provisional arrest warrant who was

3    hiding in Colombia.  Again, my client provided the

4    exact location where this individual was hiding.  I

5    don't want to get into any details, but -- and my

6    client also had his individual -- had his associates

7    provide surveillance.

8         Information was passed on a daily basis to the

9    law enforcement who, in turn, had to get the

10   Colombians involved.  Four days went by.  When they

11   finally got to this location, this wanted, indicted

12   individual had fled.

13        There's another individual that was also

14   wanted in Colombia on Colombian charges, was on the

15   O-FACT list.  My client also provided the exact

16   location of that individual.  However, they were

17   unable, once again, to actually capture this person

18   for, I believe, technical matters, lack of a search

19   warrant.

20        Your Honor, there have been hundreds of

21   debriefings in this case.  My client has sent

22   messages to codefendants to surrender.  There's been

23   pictures shown, there's been identification made.

24   I'm sure there's been -- I'm sure Agent Cascio has

25   done a ton of DEA-6 reports.

1          Agents from other districts have come, even

2     from other countries have come to speak with my

3     client, and an enormous amount of information has

4     been passed on.  Your Honor, there have been four

5     drug seizures, and I'd like to just elaborate on one

6     Mr. Ruddy talked about, the 475 kilo go-fast.

7          Again, that was a go-fast boat.  My client had

8     provided a boat to law enforcement for use.  This

9     go-fast boat had broken down on the high seas, and

10    they were looking for another boat to be able to go

11    out and rescue it.

12         So the bad guys came and asked law

13    enforcement -- or had my client's vessel, if they

14    could use their boat and their crew go rescue this

15    distressed boat.

16         The coordinates were given at that time.  The

17    coordinates were then, obviously, relayed to the

18    United States Coast Guard which seized the boat,

19    seized the 475 kilos of cocaine, and four arrests

20    were made.  And as Mr. Ruddy also points out, there

21    was 200 gallons of liquid cocaine.  I don't know how

22    much that -- kilos that is, but that was actually

23    seized at a Colombian port.

24         Your Honor, the two other -- two other matters

25    involved drug seizures.  One was a courier who was

1    traveling from the Colombia, Bogota airport.  That

2    information which passed on to law enforcement,

3    including his clothing description, his name, what

4    flight he was going to be traveling on.  That

5    information was passed on to DEA in Bogota.

6         This individual had received seven kilos of

7    heroin inside of the airport by airport authorities.

8    Law enforcement were able to -- law enforcement was

9    able to make an arrest and seize the drugs.

10        And finally, Your Honor, there was a truck

11   that was en route to a Colombian port carrying

12   cocaine in a hidden compartment.  My client was able

13   to provide information regarding the type of truck,

14   the color of the truck, the tag, who the driver was.

15        Again, that information was passed down to law

16   enforcement and that truck was seized and

17   approximately seven -- 70 kilos of cocaine was

18   seized and three arrests.

19        Judge, there was also some go-fast boats that

20   were carrying cocaine, five in particular.  But it's

21   just very hard to get a go-fast boat traveling that

22   night close to shore.  We tried -- five CMA or

23   critical movement alerts were actually -- were

24   actually issued as a result of that.

25        There were a couple of cocaine labs, one being

1     a base cocaine lab and a powder cocaine lab.  We've

2     provided information about its location.  We

3     provided workers of those labs to law enforcement.

4     Those workers were interviewed.  Those workers

5     agreed to go on airplanes and help law enforcement

6     locate the exact location of the labs in an effort

7     to destroy them.  That has yet to happen.

8          And finally, Your Honor, there has been

9     threats of harm to a United States -- Assistant

10    United States Attorney in this country.  I won't

11    mention the name.  This person, this U.S. Attorney

12    received death threats, and as a result -- from an

13    organization that she was prosecuting.

14         As a result of that, the U.S. Marshal Service

15    was assigned to protect her 24 hours, seven days a

16    week.  This prosecutor asked my client if he could

17    provide any information about or have any idea as to

18    who may be able -- who may be behind this, and was

19    also given some information as to who the

20    organization was.

21         My client was able to try to provide

22    information as to who may be the actual individuals

23    that may be trying to cause harm to her.

24         And that's all I have as far as the

25    cooperation, Your Honor.

1          THE COURT:  All right.  Thank you.

2          MR. BROWN:  Your Honor, Mr. White had asked me

3     to appear as local counsel here based on our

4     discussion, I think, that we had as to how I felt

5     that having prior knowledge in the Middle District

6     as to how to evaluate this.  And as we all know, the

7     Court's going to evaluate this.

8          But I'm going to be asking on behalf of -- for

9     Mr. White on behalf of the client for 20 levels on

10    this.  I believe that 20 levels is what is fair

11    under the guidelines and prior policy of the U.S.

12    Attorney's Office in the Middle District.

13         You know, this district has chosen not to do

14    what other districts do, which is go a percentage of

15    a sentence.  I know they do that in New York.

16    Oftentimes with cooperation, you, not surprisingly,

17    get all the way to probation.  A lot of other

18    different districts do it in other ways.

19         This district, though, has repeatedly chosen

20    to give you between two to four levels for a

21    defendant's cooperation in making a new case.

22    Oftentimes, that four is definitely earned when the

23    defendant either appears at a grand jury or at a

24    trial.

25         So routinely I'm before this Court -- and for

1        the last 20 years before this Court and other judges

2        within the middle district where the government is

3        only giving two levels.  And I know my client has

4        made a case of four levels, because they've

5        testified in that case.

6            But when you add up the levels in this case,

7        it far exceeds 20 if we use the formula that the

8        government has always used over the past.  And I

9        think what's happening here is that the government

10       doesn't want to have to give that many levels.  And

11       there seems to be now this saturation policy where

12       we'll give you a formula until we get to a certain

13       number and we just can't go much lower than that.

14           And I analogize this as kind of to the rules

15       of golf.  You know, I don't make the rules but --

16       and no golfer does, but we play by the rules.  And

17       it seems that at some point the rules normally

18       penalize you, but every now and then there's a rule

19       in golf that actually helps you.

20           And this is one of those rare opportunities, I

21       think, where normally we can't get enough levels and

22       in this case he's earned enough levels.  If we use

23       the formula that's always applied, it's more than

24       eight levels.  It should be at least 20 levels.

25           And so I'm going to be asking for the 20

1    levels in this case.  I know Mr. White probably

2    feels like I'm asking for too much because he's not

3    familiar with the middle district.  But I feel that

4    it's appropriate.

5         I think you have all of the reasons for that.

6    You've got at least four indictments, not just of

7    small, five-gram crack cases, but of huge

8    indictments.  You've got at least appearing twice, I

9    believe, in front of a grand jury.  You have threats

10   to the family, you have having to move the family,

11   and then you have extensive other cases, as well.

12        THE COURT:  All right.  Thank you.  I'll grant

13   the government's motion.  The extent of departure

14   I'll determine after hearing all matters in

15   mitigation.

16        I neglected to mention that I did read the

17   letters appended to the presentence report written

18   on behalf of the defendant.

19        Matters under Section 3553, gentlemen?

20        MR. WHITE:  Yes, Your Honor.

21        MR. BROWN:  Your Honor, I'm in a trial with

22   Judge Bucklew.  Can I get the Court's permission to

23   get back to that?

24        THE COURT:  Yes.

25        MR. BROWN:  Thank you.

1      MR. WHITE:  Your Honor, in requesting a

2   variance, I would again ask the Court to consider

3   the amount of money surrendered and the manner in

4   which it was surrendered.  The manner in which it

5   was surrendered, this is not your typical forfeiture

6   case.

7      Without a doubt, without my client's exclusive

8   assistance, the government would have never found

9   this money.  This is not a typical forfeiture case

10  where the government seizes assets, the defendant in

11  the plea agreement waives his right to contest that

12  forfeiture, waives any defenses and then the

13  government seizes the assets.

14     My client could have easily said, I don't have

15  anymore money.  I can't get to the money.  It's too

16  dangerous.  I have to be present.  But -- and the

17  government would have never found it.  But my client

18  chose to do it, Your Honor.  He chose to assist the

19  United States government in locating and

20  surrendering $114 million.

21     And I don't think -- I don't think

22  extraordinary is the proper adjective for my

23  client's actions.  I think unprecedented is the more

24  appropriate adjective.  And it is unprecedented

25  because when you compare him to other similarly

1    situated defendants with similar charges, CCE,

2    similar wealth who have cooperated, it simply hasn't

3    been done.

4         You look at some of the major traffickers that

5    have passed through the U.S. District Courts in the

6    last several years, the Montoya brothers, Fabio

7    Ochoa Vasco, here a case in Tampa; Salvador Mancuso,

8    Cuco Vanoy, Victor Patino, Ross Cuneo, and the list

9    goes on.

10        All these defendants have accounts receivable.

11   But they do have money because a famous trafficker

12   called Cepeta, and I'm sorry I don't have real names

13   for you, $80 million was seized by the U.S.

14   government; seized, not voluntarily surrendered.

15   All these defendants cooperated, none voluntarily

16   gave back a dime.

17        My client's money surrender was done

18   immediately, it was done without hesitation, and it

19   was done without knowing the exact benefit that he

20   would receive.

21        Again, this was a law enforcement operation.

22   It was extremely dangerous.  It took several months.

23   I want to thank Agent Cascio for his professionalism

24   in allowing this to be such a successful operation.

25        So what is $114 million worth?  It's certainly

1   worth more than three levels that one gets for

2   accepting responsibility when they stand before the

3   court.

4        Your Honor, in my memo I argue that my

5   client's actions demonstrate the super acceptance of

6   responsibility.  There are no Eleventh Circuit

7   cases, as Mr. Ruddy points out, allowing courts to

8   vary based on the voluntary surrender of forfeitable

9   assets.  But by analogy, courts have allowed

10   downward departures based on extraordinary

11   presentence restitution.

12        In both instances, Your Honor, you have

13   defendants prior to sentencing agreeing to return

14   money that they have -- that they have from -- that

15   they've made from their crimes.  The actions of my

16   client of assisting and locating forfeitable assets

17   in advance of sentencing should also be viewed as

18   extreme remorse, or, as I call it in my memo,

19   proactive remorse.  Many cooperators sit down and

20   talk with the government.  My client was the first

21   to surrender drug profits.

22        This is a case of first impression, Your

23   Honor.  I don't think there's a case in the United

24   States District Court that has these facts.  Your

25   decision today should send a message.  You should

1      encourage similarly situated drug traffickers to do

2      the same, that is, disgorging your ill-gotten gains

3      will be recognized by district court judges as a

4      form of cooperation or as a ground for a variance.

5          I'm not suggesting that traffickers can buy

6      their way out of jail.  But forking over millions of

7      dollars does have value.  It's the same theory

8      behind a 5K1 and a Rule 35, courts rewarding

9      defendants for assisting the government.

10         And when you consider its value, clearly you

11     have to consider the amount, $114 million.  Do you

12     divide by the price of a kilo in Tampa?  Kilos are

13     destroyed.  At least money is put to good use,

14     especially in a depressed economy.  And it was put

15     to good use.

16         In my memo, Your Honor, the President of

17     Colombia used $25 million of the -- of my client's

18     drug proceeds to help victims in Colombia that were

19     devastated by massive flooding.  President Obama

20     last year awarded $30 million in military aid to

21     Colombia, just to give you an idea of the magnitude

22     of the amount of money.

23         Is surrendering $114 million worth more than

24     the defendant who testifies for the government at

25     trial?  I think it should be.

1          Your Honor, just briefly I'd mention

2     sentencing disparities.  I mentioned the Pedro

3     Navarette case in my memorandum, similar charges.

4          I would like to also talk about lastly the

5     conditions of my client's confinement.  My client

6     has been in a total isolation cell for the last

7     year.  Total isolation means total isolation.  He

8     has -- 24 hours a day, seven days a week, he's in a

9     small cell by himself.  He doesn't have any

10    television.  The lights are on continuously.  He has

11    a radio that picks up one Spanish channel.

12         He occasionally gets 45 minutes of recreation

13    time, if the guards allow him.  He has to ask

14    permission when a guard listens, he doesn't speak

15    English very well, to use the phone.  He's only

16    allowed to leave his cell to see his attorney.

17         I cited the case in my memo, the *Pressley* case

18    where, on similar facts, though not as long, an

19    inmate who was held in solitary confinement in

20    Atlanta presentence, the court there held that

21    conditions of presentence confinement could support

22    a motion for downward departure, and I'd ask the

23    Court to consider that, as well.

24         Judge, the Court already mentioned that you

25    read the family letters.  Thank you.

1          THE COURT:  Thank you, Mr. White.  Is there

2     anything the defendant would like to say?

3          THE DEFENDANT:  Yes.  Good afternoon, Your

4     Honor, prosecutor, agents, attorneys.  Thank you for

5     giving me the opportunity to express how I feel

6     today.

7          Throughout this year that I've been

8     incarcerated, that I've been in prison, isolated

9     from the jail -- rest of the jail population in an

10    isolation cell, I have had the time to re-capacitate

11    and reflect upon the damage that I caused society

12    for having committed my crimes.  And I have no

13    justification for it whatsoever, and there is no

14    justification for it whatsoever.

15         I am aware of my guilt and I deserve to be

16    punished for my actions.  And also during this year,

17    I've had the opportunity to read 77 self help books

18    and of personal growth, and they've helped me

19    greatly to change my way of thinking and to -- and

20    acting in my new life.

21         Throughout my remorse and unlimited

22    cooperation with the authorities and the government,

23    I started to make up for somehow to society -- to

24    make up for it to society.  It's the least that I

25    could do to make up for my mistakes.  And from the

1    moment that I made this decision, I turned over $14

2    million -- $114,000 that were the product of drug

3    trafficking, and I gave information related to this

4    crime.

5          And by doing that, I put my whole family in

6    imminent threat of death.  And I am grateful to the

7    government of the United States that helped me and

8    facilitated their transfer -- the transfer of my

9    family into this country.

10          And I would also like to express my

11    appreciation, as well, for having been given the

12    opportunity to cooperate with the authorities, and

13    by doing so, to be able to provide an example of

14    growth and change to my children who are still

15    young.

16          And I'd like to apologize to God, to the

17    United States -- to the society of the United

18    States, to my children and to my family for all the

19    damages I have caused.  Thank you.

20          THE COURT:  Thank you, sir.  Mr. Ruddy?

21          MR. RUDDY:  Nothing further, Your Honor.

22          THE COURT:  Let me begin first -- Mr. Brown is

23    absent.  Let me thank him and Mr. White for your

24    presentation and Mr. Ruddy, and for the sentencing

25    memorandums which were informative.

1          Section 3553(a) of Title 18 sets forth a

2     series of sentencing considerations, the ultimate

3     goal being to impose a fair sentence, one which is

4     sufficient but not greater than necessary to satisfy

5     these statutory purposes.

6          I begin first by pointing out the seriousness

7     of the offense for which this defendant has pled

8     guilty and accepted responsibility.  Rarely in the

9     courts of this country do you see the size and

10    complexity represented by these conspiracies in

11    these cases, including this one.  We are beginning

12    to see them because of the successful efforts of law

13    enforcement.  They are, simply put, mind boggling.

14    The amount of money and cocaine involved gives one

15    pause.

16          The seriousness of the offense should be

17    reflected by the sentence.  It's not just the use of

18    cocaine.  It's the devastating impact of that

19    substance on this country, on the neighborhoods of

20    this country when that cocaine is converted to

21    crack, and the destruction and economic damage

22    resulting from not only the use and the trafficking

23    of cocaine, but the attendant economic crimes and

24    any number of criminal offenses which can be tied

25    directly to the use and abuse of crack cocaine and

1     powder cocaine.

2          This country has invested untold millions and

3     billions of dollars in combatting drug trafficking.

4     Notwithstanding the staggering amount of

5     disgorgement this defendant has voluntarily made, I

6     would only speculate that it's significantly less

7     than what this country has invested in investigating

8     and prosecuting individuals like this defendant.

9          It's unfortunate.  One, that the crimes are

10    committed but, two, that this country has to devote

11    significant resources to combatting these types of

12    offenses.  And that is why this defendant scores out

13    to life.  And life in the federal system is life.

14         He has to his credit done what he can to put

15    himself in the best position he can be in at this

16    juncture, including but not limited to his voluntary

17    disgorgement of in excess of $114 million.  And he

18    has cooperated.

19         Words like significant, beyond excellent

20    memory, countless debriefings, having done

21    everything possible to provide information, those

22    are strong words and indicative of the weight the

23    government gives to this defendant's cooperative

24    efforts, and those will, no doubt, continue.

25         There are two perspectives on cooperation,

1        Senor, that I see.  One is you have provided

2        significant, substantial, extraordinary cooperation,

3        which is a good thing.  But on the other hand, you

4        are in a position to have done so, which is not such

5        a good thing.  The higher up in these drug

6        trafficking organizations, the more an individual

7        can offer by way of substantial assistance.

8              And I recall as I sit here in every one of

9        these sentencings these poor crewmen onboard these

10       go-fasts who are serving, at least from my

11       perspective, anywhere from six or seven to 21 years

12       in United States prisons without the ability to

13       provide information and cooperation.  Some of them

14       will die in prison, no doubt.  Most of them will

15       languish, lose contact with their families.  And you

16       must shoulder that responsibility.

17             I'm not here to send a message, Mr. White.  I

18       appreciate the argument and the suggestion.  But,

19       certainly, I have on occasion departed beyond what

20       the government has recommended for the very purpose

21       of indicating to a particular defendant that there

22       is a judicial recognition of the significance of

23       cooperation.  But every case depends on its own

24       facts, of course.

25             I place significance on the extent and quality

1    of the government's -- or the assessment of the

2    quality and significance of the defendant's

3    cooperation by the government.  That is why I

4    pondered what seemingly was a slightly different

5    approach in the unrelated but similar case.

6         I am not necessarily persuaded by this

7    argument that this district, this United States

8    Attorney's Office does not fairly and adequately

9    assess cooperation.  That is an executive function.

10   And it certainly differs from jurisdiction to

11   jurisdiction.  But I can only deal with what is

12   before me.  This United States Attorney's Office has

13   determined an eight-level departure is appropriate.

14        Several matters stand out to me in addition to

15   the voluntary disgorgement, which I don't choose to

16   characterize as super acceptance of responsibility.

17   I think it certainly is perhaps accurately called

18   that.  But at the same time, as I said, he is able

19   to do what he can do because he's in a position to

20   do that.  It simply is a factor I will consider in

21   imposing an appropriate sentence.  I don't believe

22   it to be a basis for a downward departure.  It's

23   more appropriately considered a basis for a

24   variance.

25        Conditions of confinement, I do not find

1    anything in the description that justifies a

2    downward departure.  Incarceration is what it is.

3    He certainly has not been mistreated.  He has been

4    fed, cared for, provided the comfort and security of

5    a safe prison environment, absent of which he may

6    very well have been subjected to retaliatory

7    measures.

8         His family has relocated.  They have been able

9    to avail themselves of the generosity of the United

10   States government.  That has mitigated at least to

11   some degree the risk attendant to this defendant's

12   drug activities; a benefit, in my view, to the

13   defendant.

14        Ultimately, having considered all these

15   matters, it simply is a matter of how much time is

16   sufficient but not greater than necessary to reflect

17   the statutory purposes of sentencing.

18        Considering the defendant's cooperative

19   efforts, the extent of the disgorgement, his

20   voluntary coming forward in Argentina with his

21   attorney to begin this process, waiving extradition,

22   or at least consenting to extradition, being

23   available to the agent on countless occasions, being

24   available to distant United States Attorney's

25   Offices for cooperation, all of those matters are

1       certainly matters which should be reflected in the

2       sentence.

3              Ultimately, the sentence should promote

4       respect for the law, act as a deterrent and protect

5       the public.  Apparently that's working, Mr. White,

6       because these higher-up traffickers are beginning to

7       come forward on their own, realizing that their

8       apparent days of liberty are numbered.  So I suspect

9       that that is a semblance of deterrence.  You would

10      know more than me.

11             Having considered all these matters, I have

12      determined, after granting the 5K1.1 motion, which

13      is docket 58, I'm going to depart downward ten

14      levels to a level 33 to reflect, in addition to the

15      government's evaluation of the defendant's

16      cooperative effort's, the Court's evaluation.

17             He may or may not be back before the Court for

18      an additional consideration under Rule 35.  I

19      presume that he will.  That would take this

20      defendant to a level 33, a range of 135 to 168

21      months.

22             I am going to vary from that, however, and

23      impose a sentence pursuant to the Sentencing Reform

24      Act of 1984 to a terms of 120 months as to Counts

25      One, Two, Four and Five, consistent with the

1     statutory minimum mandatory penalty, but also in

2     recognition of the defendant's substantial

3     assistance.  A sentence at the level suggested by

4     defense counsel would not promote the statutory

5     purposes of sentencing.  As to Count Three, a

6     sentence, likewise, of ten years, those terms to run

7     concurrent.

8          Upon his release, he will serve a five-year

9     period of supervised release as to each count.

10    Those terms, again, to run concurrent.  Subject to

11    the standard terms and conditions adopted by this

12    court, special conditions being if he is deported,

13    he shall not reenter the United States without the

14    express permission of the United States government.

15         If he is supervised, which I presume he may

16    be, he is subject to the mandatory drug testing

17    requirements of the Violent Crime Control Act.  This

18    is a qualifying felony.  He will cooperate in the

19    collection of DNA as directed by his probation

20    officer.  He will provide probation with access to

21    all financial information upon request.

22         What says the government as to a fine?

23         MR. RUDDY:  Your Honor, the defendant does

24    possess significant assets, none of which are in the

25    United States.

1            THE COURT:  But he does have the ability to

2       pay a fine, assuming he liquidates those assets.

3            MR. RUDDY:  Yes, sir.

4            THE COURT:  Mr. White, any comments on that,

5       sir?

6            MR. WHITE:  Judge, the only thing I can tell

7       you is that the assets that are listed in paragraph

8       -- paragraph 75 of the PSI, there's six properties.

9       We've actually in an effort to -- there's a

10      forfeiture procedure happening in Colombia.  These

11      assets, we were attempting to forfeit to the

12      Colombian government.  That has not happened.  So

13      all I can tell you is these are assets.  They still

14      exist.  They still have a value.  And I don't know

15      what efforts can be made to try to liquidate those.

16           THE COURT:  All right.  I'll impose a fine of

17      $50,000, recognizing that the defendant does have

18      the ability to pay, although with some difficulty.

19      He is also assessed a 500-dollar special assessment.

20      That's $100 per count of conviction, which is due

21      immediately.

22           Is there a separate forfeiture order sought by

23      the government?

24           MR. RUDDY:  I don't believe so, Your Honor.

25           THE COURT:  All right.  Of course, by the

1    extent of his -- as a result of his cooperative

2    efforts under Section 5K1.1, this defendant is not

3    subject to the minimum mandatory penalties provided

4    by law.

5        What says the government as to the underlying

6    indictment?

7        MR. RUDDY:  Oh, Your Honor, we move to dismiss

8    the original indictment.

9        THE COURT:  As to this defendant, that motion

10   is granted.  The original indictment is dismissed.

11       Mr. White, do you have a facility you'd like

12   me to recommend?

13       MR. WHITE:  Yes, Judge.  Anywhere close to the

14   southern -- South Florida area, please.

15       THE COURT:  Well, there's one.  Obviously, we

16   have Coleman here and Miami down in --

17       MR. WHITE:  Coleman first, Miami second.  I'm

18   sorry, Miami first, Coleman second.  Excuse me.

19       THE COURT:  Okay.  I'll recommend designation

20   at Miami and alternatively Coleman.

21       Having pronounced sentence, are there any

22   objections to the sentence imposed or the manner in

23   which it has been pronounced?  Mr. Ruddy?

24       MR. RUDDY:  No, Your Honor.

25       THE COURT:  Mr. White?

1          MR. WHITE:  No, Your Honor.

2          THE COURT:  Gentlemen, thank you.  Let me then

3     advise Senor Caicedo-Velandia, you do have 14 days

4     to appeal the judgment and sentence of the Court.

5     You are entitled to be represented by an attorney.

6     If you're not able to pay one, the Court will

7     appoint a lawyer to represent you on appeal, and the

8     clerk will accept your appeal without payment of the

9     filing fee.

10          Mr. White will review with you the advantages

11     and disadvantages of filing an appeal, not the least

12     of which is the effect on your eligibility for a

13     Rule 35 motion.  It is your decision, however.  Just

14     be aware that you must make that decision within 14

15     days so that the appeal can be filed timely.

16          And if you determine not to appeal, of course,

17     your attorney will document his file to reflect that

18     important decision.  Do you have any questions about

19     that, sir?

20          THE DEFENDANT:  No.

21          THE COURT:  All right.  Buenos suerte, Senor.

22     Thank you, gentlemen.

23          COURTROOM SECURITY OFFICER:  All rise.

24          (Proceedings concluded at 3:15 PM.)

25

```
1                    C E R T I F I C A T E

2

3     STATE OF FLORIDA          )

4     COUNTY OF HILLSBOROUGH    )

5        I, Linda Starr, RPR, Official Court Reporter for

6     the United States District Court, Middle District,

7     Tampa Division,

8        DO HEREBY CERTIFY, that I was authorized to and

9     did, through use of Computer Aided Transcription,

10    report in machine shorthand the proceedings and

11    evidence in the above-styled cause, as stated in the

12    caption hereto, and that the foregoing pages,

13    numbered 1 through 80, inclusive, constitute a true

14    and correct transcription of my machine shorthand

15    report of said proceedings and evidence.

16        IN WITNESS WHEREOF, I have hereunto set my hand in

17    the City of Tampa, County of Hillsborough, State of

18    Florida, this 4th day of January 2012.

19

20

21          /s/ Linda Starr
            Linda Starr, RPR, Official Court Reporter
22

23

24

25
```